******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JAMAL SUMLER
(AC 43024)

Prescott, Devlin and Bishop, Js.

*Syllabus*

Convicted, after a jury trial, of the crimes of murder, conspiracy to commit robbery in the first degree and carrying a pistol without a permit, and, after a trial to the court, of the crime of criminal possession of a pistol or revolver, the defendant appealed. The defendant's conviction stemmed from an incident in which he shot and killed a convenience store clerk while he and another individual were robbing the store. Prior to trial, the defendant filed a motion in limine to preclude the state from introducing testimony from his former probation officer, D, regarding her identification of him in a surveillance video from a grocery store, and a motion to suppress two statements that he made during a conversation with a police officer while he was being transported to the police department following his arrest for violation of probation. Following a hearing, the trial court denied both motions. *Held*:

1. The defendant's unpreserved claim that the trial judge violated his constitutional right to due process by improperly failing to recuse himself from presiding over the defendant's trial because he previously had signed search and seizure and arrest warrants against the defendant in this case was unavailing: because the defendant did not assert actual bias on the part of the trial judge, his claim necessarily failed, and, therefore, he could not prevail pursuant to *State* v. *Golding* (213 Conn. 233), as he did not demonstrate the existence of a constitutional violation; moreover, this court was not persuaded by the defendant's assertion that the trial judge's failure to recuse himself constituted plain error because, at minimum, it created an appearance of impropriety, as the judge's conduct was not expressly prohibited by our rules, statutes, or case law, and, therefore, it did not constitute plain error or even error at all.

2. The trial court did not abuse its discretion in admitting D's testimony identifying the defendant in the surveillance video from the grocery store; contrary to the defendant's contention that D's testimony constituted her opinion on an ultimate issue reserved to the jury, namely, his criminal culpability, in violation of the applicable rule (§ 7-3) of the Connecticut Code of Evidence, and, although the defendant's presence in the grocery store may have been relevant to his participation in the acts that were committed at the convenience store, D did not express an opinion regarding the identity of the person who committed the crimes at the convenience store, and, therefore, her testimony did not constitute a legal opinion about the defendant's guilt as to the crimes with which he was charged.

3. The defendant could not prevail on his claim that the trial court improperly denied his motion to suppress the statements he made to a police officer while he was being transported to the police department following his arrest, which was based on his claim that those statements were made during custodial interrogation without his being advised of his rights pursuant to *Miranda* v. *Arizona* (384 U.S. 436); the trial court properly determined that the officer's conversation with the defendant did not constitute custodial interrogation for *Miranda* purposes because the officer's questions were not reasonably likely to elicit incriminating statements from the defendant.

Argued March 9—officially released July 21, 2020

*Procedural History*

Substitute information charging the defendant with the crimes of felony murder, murder, conspiracy to commit robbery in the first degree, criminal possession of a pistol or revolver and carrying a pistol without a permit, brought to the Superior Court in the judicial

district of New Haven, where the court, *Vitale, J.*, granted the defendant's motion to sever the charge of criminal possession of a pistol or revolver; thereafter, the court denied the defendant's motions to preclude certain evidence; subsequently, the charges of felony murder, murder, conspiracy to commit robbery in the first degree and carrying a pistol without a permit were tried to the jury before *Vitale, J.*, and the charge of criminal possession of a pistol or revolver was tried to the court; verdict and judgment of guilty; thereafter, the court vacated the conviction of felony murder, and the defendant appealed. *Affirmed.*

*Naomi T. Fetterman*, with whom, on the brief, was *Peter G. Billings*, for the appellant (defendant).

*Laurie N. Feldman*, deputy assistant state's attorney, with whom, on the brief, were *Patrick Griffin*, state's attorney, and *Lisa D'Angelo*, assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Jamal Sumler, appeals from the judgment of conviction rendered following a trial in which a jury found him guilty of felony murder in violation of General Statutes § 53a-54c, murder in violation of General Statutes § 53a-54a (a), conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a) (2), and carrying a pistol without a permit in violation of General Statutes § 29-35 (a), and the trial court, *Vitale, J.*, found him guilty of criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c (a) (1). The defendant claims that the court (1) improperly failed to recuse itself from the defendant's trial because Judge Vitale previously had signed warrants for the defendant's arrest and for the search of his home, (2) abused its discretion by allowing opinion testimony of the defendant's identity on video surveillance footage, and (3) improperly denied the defendant's motion to suppress statements that he made to a police officer while being transported to the police department. We disagree and, therefore, affirm the judgment.

The following facts, which reasonably could have been found by the respective finder of fact, and procedural history are relevant to this appeal. On April 6, 2015, the defendant and two other individuals, Dwayne "Hoodie" Sayles and Leighton Vanderberg, were travelling together in a green Ford Focus driven by Vanderberg. The defendant sat in the front passenger seat and was wearing sweatpants, a gray hoodie, and dark sneakers. Sayles sat in the backseat and was wearing gray sweatpants, a white T-shirt, and white sneakers.[1]

The three men drove to Eddy's Food Centre (Eddy's) located at 276 Howard Avenue in Bridgeport. Once they arrived, the defendant exited the car, while Vanderberg and Sayles remained inside. Before going into the store, the defendant removed a black revolver from his waistband and put it in the center console of the car. He went into Eddy's for a few minutes, returned to the car, and then went back into the store a second time. Upon his return to the car the second time, the defendant handed Sayles a pair of black gloves. He also retrieved his revolver and put it in the waistband of his sweatpants.

Thereafter, the three men drove to the Fair Haven section of New Haven. Vanderberg pulled onto Kendall Street toward Fulton Terrace and parked the car, intending to smoke "dutches."[2] Not having enough cigars, someone suggested that they buy more cigars from a nearby store. The defendant and Sayles then exited the vehicle and walked up Fulton Terrace, with the defendant a few steps in front of Sayles, while Vanderberg remained in the car. The defendant entered the Pay Rite convenience store (Pay Rite) connected to a

CITGO gas station located at 262 Forbes Avenue.

Pay Rite surveillance videos captured the defendant, wearing a black mask, black gloves, a gray hoodie, gray sweatpants, and dark sneakers, walk to the counter and point a gun at the clerk, Sanjay Patel, the victim in this case. While pointing the gun at the victim, the defendant walked behind the counter. The surveillance footage captured a second individual—later determined to be Sayles—dressed in a black mask and black gloves, a navy blue hoodie, black sweatpants, and white sneakers, entering the store and walking up to the counter. The victim struggled with the defendant and picked up a wooden stool. Sayles then pulled out a gun, aimed it at the victim, fired, and put the gun away in his hoodie pocket. The defendant, pointing his gun at the victim, used his other hand to pass items over the counter to Sayles, who put the items in his pocket before turning and leaving the store. As the defendant bent down to take more items, the victim hit him on his upper body with the stool. The defendant then shot the victim and ran out of the store. The victim subsequently died from his injuries.[3]

A witness, Jonathan Gavilanes, who was across the street from Pay Rite with his father, heard the gunshots and saw flashes. Subsequently, he saw the defendant and Sayles run out of the store onto Fulton Terrace. Gavilanes' father checked inside Pay Rite and directed Gavilanes to call 911.[4]

Meanwhile, Sayles was the first to return to the car; he was still wearing the black gloves and holding a box of cigars. The defendant followed soon thereafter. The three men then drove toward Church Street South, an apartment complex where Sayles' apartment was located. After they parked in a nearby parking lot, Sayles threw the navy blue sweatshirt that he had been wearing into a dumpster. He also took the cigars out of their box and threw the box in the dumpster. Sayles then gave Vanderberg some cigars and twenty dollars as a contribution to gas money.

The three men then went to Sayles' apartment. Once inside, Vanderberg asked Sayles and the defendant about what had happened at Pay Rite. At first, neither individual told Vanderberg any specific details regarding the incident. Later, however, the defendant admitted to Vanderberg that he had "stretched" the store clerk, which Vanderberg testified at trial meant to him that the defendant had robbed the clerk.[5]

Vanderberg did not learn of the death of the victim until the next morning, when one of his friends asked if he had heard about it. He later saw news coverage of the incident at Pay Rite. After seeing the coverage, Vanderberg contacted the police and provided a statement on April 14, 2015.[6] When shown still photographs from the surveillance video from Pay Rite at the time

of the incident, Vanderberg identified the subjects as the defendant and Sayles. On April 15, 2015, the police also obtained video surveillance footage from Eddy's, which showed the defendant purchasing a pair of dark colored gloves before leaving the store, reentering the store shortly thereafter, and purchasing a second pair of dark colored gloves.

On April 17, 2015, the defendant was arrested at his home on a warrant for violating his probation. The police immediately applied for a search and seizure warrant for his home, asserting that there was probable cause to believe that evidence of the robbery and murder that took place at Pay Rite would be found therein. The court, *Vitale, J.*, reviewed the application and issued a search and seizure warrant for the defendant's home.[7]

On May 14, 2015, the police submitted an application for an arrest warrant, asserting that probable cause existed to charge the defendant for the robbery and murder of the victim. Judge Vitale also reviewed this application and issued the arrest warrant. The state subsequently filed a long form information charging the defendant with felony murder, murder, conspiracy to commit robbery in the first degree, criminal possession of a pistol or revolver, and carrying a pistol without a permit.

The defendant elected a jury trial but moved to sever the count alleging criminal possession of a pistol or revolver and sought a bench trial on that count.[8] The motion was granted, and the state filed two substitute informations.

Prior to trial, the defendant also filed a motion in limine to preclude the state from introducing testimony from the defendant's former probation officer, Jayme DeNardis, concerning her identification of the defendant in the Eddy's surveillance footage. Citing *State* v. *Finan*, 275 Conn. 60, 881 A.2d 187 (2005), the defendant argued that DeNardis' testimony was inadmissible because it pertained to an ultimate issue of fact for the trier, namely, whether the defendant was the individual who committed the crimes. The court denied the motion in limine.

The defendant also filed a motion to suppress two statements that he made to the police following his arrest but before he was advised of his constitutional rights: "I'm infatuated with guns," and "I always wanted to be a bank robber." The defendant argued that the admission of these statements would infringe on his *Miranda* rights.[9] The court denied the motion to suppress.

The trial began on October 31, 2017, and concluded on November 7, 2017. The jury found the defendant guilty of all counts submitted to it.[10] The court found the defendant guilty of the charge of criminal possession

of a pistol or revolver. The defendant subsequently was sentenced to a total effective sentence of ninety years of incarceration. This appeal followed.[11]

## I

The defendant first claims that the trial judge improperly failed to recuse himself from presiding over the defendant's trial after having signed search and seizure and arrest warrants against the defendant in this matter. This claim is unpreserved because the defendant failed to seek the disqualification of Judge Vitale in the trial court. Without conceding that the claim is unpreserved, the defendant asserts that he nonetheless would be entitled to prevail on this claim pursuant to the standards set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), or pursuant to the plain error doctrine. See *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 150, 84 A.3d 840 (2014). Specifically, the defendant asserts that the court's conduct "deprived [him] of a fair determination of guilt, in violation of his rights under article first, § 8, of the Connecticut constitution and his right to due process of law under the state and federal constitutions, U.S. Const., amends. V [and] XIV; Conn. Const., art. I, §§ 8 [and] 9." We disagree.

Generally, we do not consider claims of error on appeal that were not properly raised before the trial court. See Practice Book § 60-5. Unpreserved claims of constitutional error, however, may be reviewed when they allege the violation of a constitutional right. Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40.

Specifically, as it relates to judicial disqualification, the question under *Golding* "is not whether the trial judge's failure to disqualify himself constituted an abuse of discretion, but whether that failure resulted in a violation of the defendant's constitutional right to due process. The United States Supreme Court consistently has held that a judge's failure to disqualify himself or herself will implicate the due process clause only when the right to disqualification arises from *actual bias* on the part of that judge." (Emphasis in original.) *State* v. *Canales*, 281 Conn. 572, 593–94, 916 A.2d 767 (2007). "Recusal is required when, objectively speaking, the

probability of actual bias on the part of the judge or [decision maker] is too high to be constitutionally tolerable." (Internal quotation marks omitted.) *Rippo* v. *Baker*, U.S. , 137 S. Ct. 905, 907, 197 L. Ed. 2d 167 (2017).

In the present case, the defendant fails to allege any actual bias on the part of the trial judge. In his appellate brief, the defendant points to the existence of "an appearance that the judge was not fair and impartial in this case and that is contrary to the appearance of justice." The law is clear, however, that the mere appearance of bias is insufficient to implicate a due process violation. See *State* v. *Canales*, supra, 281 Conn. 594. Because the defendant has not asserted actual bias on the part of Judge Vitale, his claim that his constitutional right to due process was violated necessarily fails. See id. Therefore, the defendant cannot prevail pursuant to *Golding* because he has not demonstrated the existence of a constitutional violation.

We turn next to the defendant's argument that Judge Vitale's failure to recuse himself as the trial judge and as the trier of fact with respect to the charge of criminal possession of a pistol or revolver despite his earlier role in signing the search and seizure and arrest warrants constitutes plain error because, at a minimum, it created an appearance of impropriety. We disagree.

"An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily [discernible] on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . This determination clearly requires a review of the plain error claim presented in light of the record. . . . In *State* v. *Fagan*, [280 Conn. 69, 87, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007)], we described the two-pronged nature of the plain error doctrine: [An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is *both* so clear *and* so harmful that a failure to reverse the judgment would result in manifest injustice." (Emphasis in original; internal quotation marks omitted.) *State* v. *Jamison*, 320 Conn. 589, 596–97, 134 A.3d 560 (2016).

The defendant concedes that "[t]here is no statute or rule that expressly prohibits a judge who issues an arrest warrant or search warrant for a particular defendant, from later presiding at that defendant's trial." Nonetheless, he seems to argue that, under the totality of the circumstances, the court's failure to recuse itself constitutes a violation of the Code of Judicial Conduct and, thereby, a violation of Practice Book § 1-22 (a).

Practice Book § 1-22 (a) provides in relevant part: "A judicial authority shall, upon motion of either party or upon its own motion, be disqualified from acting in a

matter if such judicial authority is disqualified from acting therein pursuant to Rule 2.11 of the Code of Judicial Conduct . . . ." Rule 2.11 of the Code of Judicial Conduct expressly enumerates situations that require disqualification, although they are not exhaustive.[12] The defendant argues that the provision in rule 2.11 (a) that a judge shall disqualify himself when he has a personal bias or personal knowledge of facts in dispute is applicable in this matter. In particular, he argues that by reviewing and signing the search and seizure and arrest warrants, Judge Vitale necessarily reached conclusions about the evidence in the warrants, including the credibility of the state's witnesses. These circumstances, the defendant contends, give rise to an appearance of impropriety as contemplated by rule 2.11.

Although rule 2.11 (a) of the Code of Judicial Conduct instructs that a judge shall disqualify himself or herself when he or she has a personal bias or personal knowledge of facts in dispute, our case law has explicitly clarified that, to require recusal, a judge's potential bias "must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." (Internal quotation marks omitted.) *Tracey* v. *Tracey*, 97 Conn. App. 278, 283–84, 903 A.2d 679 (2006). "With certain well-defined exceptions . . . a judge's participation in the preliminary stages of a case, and the knowledge he or she thereby gains, will not ordinarily preclude his or her continued participation in the same case thereafter." (Footnote omitted.) *State* v. *Rizzo*, 303 Conn. 71, 119–20, 31 A.3d 1094 (2011), cert. denied, 568 U.S. 836, 133 S. Ct. 133, 184 L. Ed. 2d 64 (2012).[13]

In the present matter, to the extent that Judge Vitale learned of facts from the warrant applications that were not introduced at trial, and, to the extent that he made preliminary determinations for purposes of the warrants, his act of presiding over the defendant's jury trial and serving as the trier of fact on one of the charges, despite such involvement in the earlier proceedings, is not expressly prohibited by our rules, statutes, or case law. Accordingly, we are not persuaded that the court's conduct was plain error, or even error at all.

## II

The defendant next claims that the court abused its discretion by denying his motion in limine to preclude DeNardis from identifying him in a still photograph and a surveillance video from Eddy's, because her "testimony . . . constituted inadmissible lay opinion as to the guilt of the defendant" under *State* v. *Finan*, supra, 275 Conn. 66, and § 7-3 (a) of the Connecticut Code of Evidence. We disagree.

The following additional facts are relevant to this issue. On April 17, 2015, detectives met with DeNardis,

the defendant's previous probation officer.[14] DeNardis viewed a still photograph from video surveillance footage captured from Eddy's on April 6, 2015. She signed the photograph and identified the defendant as the individual in the footage and as being one of her probationers. The defendant filed a motion in limine to preclude DeNardis from testifying at trial as to the identity of the individual captured on surveillance video footage from Eddy's. He claimed that her identification of him in the video would, pursuant to *Finan*, constitute improper testimony as to "the ultimate issue in question: identity."

A hearing was held on October 26, 2017, during which the state presented DeNardis and Detective Christopher Perrone as witnesses.[15] The defendant reiterated his objection to the admission of DeNardis' proffered testimony on the basis that it constitutes her opinion about the ultimate issue of fact—whether he was the individual on the surveillance video committing the crimes with which he was charged—which is prohibited under *Finan*.[16]

The court denied the defendant's motion in limine, concluding that the proffered evidence is not "tantamount to a legal opinion about the defendant's criminal culpability." The court summarized its findings as follows: "The record reflects that . . . DeNardis is not claimed to be an eyewitness to the crime that occurred in Pay Rite . . . and, further, that the crime now before the court did not occur at Eddy's . . . ." The court then explained that the proffered evidence "does not encompass an ultimate issue before the jury, namely, whether the defendant was one of the individuals present inside of the Pay Rite . . . at the time the crimes before the jury were committed." It explained that the jury could "view the tape, the still photograph from the tape, and the defendant himself to determine if he is the person depicted in the video or not."

At trial, DeNardis testified, among other things, that, in the course of her employment, she met with the defendant fifty-nine times from May, 2013 to April, 2015, and, that on April 17, 2015, she identified the defendant in a still photograph shown to her by New Haven police. She was shown at trial two segments from the surveillance video at Eddy's and identified the defendant as the person in the footage. At the conclusion of the trial, the court instructed the jury that "identification is a question of fact for you to decide, taking into consideration all of the evidence that you have seen and heard in the course of the trial."

We first set forth our standard of review. "Because of the wide range of matters on which lay witnesses are permitted to give their opinion, the admissibility of such evidence rests in the sound discretion of the trial court, and the exercise of that discretion, unless abused, will not constitute reversible error." (Internal quotation

marks omitted.) *State* v. *Finan*, supra, 275 Conn. 65–66.

We begin our analysis with § 7-3 (a) of the Connecticut Code of Evidence, which provides: "Testimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact, except that, other than as provided in subsection (b), an expert witness may give an opinion that embraces an ultimate issue where the trier of fact needs expert assistance in deciding the issue." "[T]he phrase ultimate issue is not amenable to easy definition. . . . It is improper for a witness to offer testimony that essentially constitutes a legal opinion about the guilt of the defendant. . . . An ultimate issue is one that cannot reasonably be separated from the essence of the matter to be decided [by the trier of fact]." (Citation omitted; internal quotation marks omitted.) *State* v. *Holley*, 160 Conn. App. 578, 617, 127 A.3d 221 (2015), rev'd on other grounds, 327 Conn. 576, 175 A.3d 514 (2018).

The defendant argues that DeNardis' identification of him in the video surveillance footage constitutes her opinion on an ultimate issue, namely, his culpability, in violation of § 7-3 of the Connecticut Code of Evidence, as interpreted by our Supreme Court in *Finan*. In *Finan*, the defendant moved to preclude the testimony of certain police officers as to their opinion that he was depicted on surveillance footage of the armed robbery for which he was charged. *State* v. *Finan*, supra, 275 Conn. 62. Our Supreme Court held that the testimony should have been precluded because the officers' opinion went to the ultimate issue in the case, which was "whether the defendant, and not some other person, was one of the two [men] who had committed the robbery." (Internal quotation marks omitted.) Id., 67.

We disagree with the defendant that DeNardis' testimony embraced an ultimate issue for the jury in the present matter. *Finan* is distinguishable because the surveillance footage in *Finan* depicted events that took place at the scene of the crime for which the defendant was charged. Here, the video that was shown to DeNardis was from Eddy's, an entirely separate location from the Pay Rite where the armed robbery took place.

In *Holley*, this court addressed a similar issue involving the identification of a defendant in video footage from a different location. *State* v. *Holley*, supra, 160 Conn. App. 617–18. In that case, the police disseminated to the public still photographs of two individuals from surveillance footage captured on a bus after the individuals committed a home burglary. Id., 583–84. At trial, a woman who knew the defendant identified him as one of the men in the video. Id., 616. This court concluded that the woman's testimony was not precluded by § 7-3 of the Connecticut Code of Evidence because the testimony did not embrace an ultimate issue. Id., 617. Specifically, this court stated that "[t]he defen-

dant's presence on the bus . . . did not directly shed light on [among other things] his conduct at the victim's residence, [or] whether the defendant had the criminal intent related to the offenses with which he was charged . . . ." Id., 618. Therefore, this court concluded that the defendant's presence on the bus was not "the essence of the matters to be decided by the jury." Id.

The analysis conducted by this court in *Holley* is instructive in the present matter. Here, DeNardis' testimony that she recognized the defendant in the surveillance video from Eddy's did not constitute a legal opinion about his guilt as to the offenses with which the defendant was charged in this case, which occurred at Pay Rite. Although the defendant's presence in Eddy's may be relevant to his participation in acts that were committed at Pay Rite, DeNardis did not express an opinion regarding the identity of the person who committed the crimes at Pay Rite. Accordingly, we conclude that DeNardis' testimony did not constitute an opinion on the ultimate issue reserved to the jury, and, therefore, the court did not abuse its discretion in admitting the testimony.

### III

Lastly, the defendant claims that the court improperly denied his motion to suppress statements that he made to a police officer after being arrested. Specifically, he claims that the statements were inadmissible because they were made as a result of custodial interrogation and he had not received his *Miranda* warnings at the time he made those statements. We disagree with the defendant's claim that the statements should have been suppressed.

The following additional facts are relevant to this claim. After the defendant was placed under arrest on April 17, 2015, Officer Jason Aklin was tasked with transporting him to the police department. During the car ride, the defendant, unprompted, asked Officer Aklin what kind of gun he carried. Officer Aklin asked the defendant why he was concerned about that, and the defendant replied, "I'm infatuated with guns. I love them." Officer Aklin then asked the defendant, "What d[id] you want to be growing up?" The defendant replied, "I always wanted to be a bank robber." At the station, the police provided the defendant the required *Miranda* advisement.

The state sought to introduce at trial the two statements that the defendant made to Officer Aklin shortly after he was taken into custody: "I'm infatuated with guns," and "I always wanted to be a bank robber." The defendant filed a motion to suppress these statements, arguing that he made the statements while under custodial interrogation without being properly advised of his *Miranda* rights. A suppression hearing was held on October 26, 2017, during which Officer Aklin testified

to his interactions with the defendant on April 17, 2015.[17] The state conceded at the suppression hearing that the defendant was in custody and had not yet received *Miranda* warnings at the time he made the statements. The state argued, however, that, because Officer Aklin's questions were not reasonably likely to elicit incriminating responses from the defendant, the statements need not be suppressed.

The court stated that "[t]he only claim or issue [it] ha[d] been alerted to insofar as the statements are concerned . . . is whether they were the product of interrogation. The defendant bears the burden of proving that interrogation occurred." It found that "[t]here [was] no evidence Officer Aklin was involved in the investigation of the crimes charged . . . [or that he] was familiar with any aspect of the investigation . . . ." After noting that "interrogation" for purposes of *Miranda* refers to "words or actions on the part of the police other than those normally [attendant] to arrest in custody that the police should know are reasonably likely to elicit an incriminating response from the suspect," the court concluded that "the two statements in question made by the defendant were not the result of conduct by Officer Aklin designed to elicit incriminating statements," nor were they reasonably likely to elicit incriminating responses from the defendant. It denied the motion to suppress, and the statements were introduced to the jury at trial.

We begin by setting forth the applicable standard of review and governing legal principles. "Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . ." (Internal quotation marks omitted.) *State* v. *Ramos*, 317 Conn. 19, 30, 114 A.3d 1202 (2015).

"It is well established that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Miranda* v. *Arizona*, [384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)]. Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 302 Conn. 287, 294, 25 A.3d 648 (2011). "[T]he ultimate determination . . . of whether a defendant already in custody has been subjected to interrogation . . . presents a mixed question of law and fact over which our review is plenary, tempered by our scrupulous examination of the record to ascertain whether the findings are supported

by substantial evidence." (Internal quotation marks omitted.) *State* v. *Ramos*, supra, 317 Conn. 30.

"Whether a defendant in custody is subject to interrogation necessarily involves determining first, the factual circumstances of the police conduct in question, and second, whether such conduct is normally attendant to arrest and custody or whether the police should know that such conduct is reasonably likely to elicit an incriminating response." (Internal quotation marks omitted.) Id., 29. "The defendant bears the burden of proving custodial interrogation. . . . [T]he definition of interrogation [for purposes of *Miranda*] can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response. . . . The test as to whether a particular question is likely to elicit an incriminating response is objective; the subjective intent of the police officer is relevant but not conclusive and the relationship of the questions asked to the crime committed is highly relevant." (Emphasis in original; internal quotation marks omitted.) *State* v. *Smith*, 321 Conn. 278, 288–89, 138 A.3d 223 (2016).

In the present case, we conclude that the trial court properly determined that Officer Aklin's conversation with the defendant did not constitute custodial interrogation for *Miranda* purposes because Officer Aklin's questions were not reasonably likely to elicit incriminating responses from the defendant. In regard to the defendant's first statement ("I'm infatuated with guns"), the record reveals that it was the defendant, and not Officer Aklin, who initiated the exchange between the two by asking the officer about his firearm. It was only in response to the defendant's spontaneous question that Officer Aklin questioned why the defendant was concerned with what type of firearm he carried. Even though the exchange that led to the defendant's second statement ("I always wanted to be a bank robber") was initiated by Officer Aklin, we are of the view that both of Officer Aklin's questions were merely conversational in nature and not made for purposes of eliciting inculpatory statements from the defendant. See *State* v. *Vitale*, 197 Conn. 396, 412, 497 A.2d 956 (1985) (statements made by defendant during general conversation with officer were not result of interrogation). In fact, regarding the second statement, the record indicates that Officer Aklin asked the defendant what he wanted to be when he grew up to change the subject away from firearms, a subject that made the officer uneasy. See *State* v. *Labarge*, 164 Conn. App. 296, 316, 134 A.3d 259 (there was no interrogation where officer's questions to defendant were made as conversation intended to defuse stressful process and not for purposes of soliciting incriminating information), cert. denied, 321 Conn. 915, 136 A.3d 646 (2016). Moreover, Officer Aklin was not privy to the investigation of the crimes at issue before us. The defendant was arrested for an unrelated

violation of probation, and, thus, it would be unreasonable to conclude that Officer Aklin reasonably should have anticipated that his questions would elicit incriminating responses regarding crimes for which the officer was unaware.

For the foregoing reasons, we are not persuaded that, in his exchanges with the defendant on the way to the police department, Officer Aklin should have known that his questions were reasonably likely to elicit incriminating statements from the defendant. Accordingly, we conclude that the court properly denied the defendant's motion to suppress the statements he made to Officer Aklin while in custody.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] At some point, Vanderberg gave Sayles a navy blue sweatshirt from his car, which Sayles put on over his white T-shirt.

[2] A "dutch" is a marijuana filled cigar.

[3] The cause of death was determined to be gunshot wounds from five bullets in his chest and abdomen and one in his hand. Jill Therriault, who worked in the division of scientific services of the Department of Emergency Services and Public Protection as a forensic science examiner in the firearm and toolmark unit, testified that the bullets had been fired from two different guns. One of the guns was .25 caliber and the other was .38 caliber.

[4] The New Haven Police Department responded to a report that a person had been shot at Pay Rite. After arriving at the scene, Officer Elsa Berrios observed multiple cigars on the sidewalk at the corner of Fulton Terrace and Kendall Street; they were collected and photographed as part of the investigation.

[5] The following line of questioning between Vanderberg and the prosecutor occurred at trial:

"Q. It was just you and the defendant?

"A. Yes.

"Q. Okay. Tell us how that conversation came to be, what you said?

"A. Well, we was—when I was leaving out, he was like everybody come out here and smoke real quick. Something like that. And I just kept looking at him. I was like, yo, what really happened? What are you playing? He was like, nah, it wasn't really much. He was like just some—like some silly shit. I ended up like, I mean, robbing him. That's it.

"Q. He ended up—he said he ended up robbing him? Is that the exact words that he used?

"A. More like stretched him. . . .

"Q. Well what I'm asking you, is that what he said, stretched him? And what does that mean to you?

"A. Robbed him."

[6] Vanderberg pleaded guilty to one count of aiding and abetting robbery in the first degree in another matter and agreed to testify for the state in this matter pursuant to a plea agreement.

[7] The police executed the search and seizure warrant at the defendant's home and seized, among other things, the following items as evidence: a plastic bag containing nine millimeter rounds and .38 caliber rounds, a pair of dark gray sweatpants, black knit gloves, and a black face mask.

[8] The defendant stipulated that he had been convicted of a felony prior to April 6, 2015, and, therefore, the court should consider that element of the count as proven.

[9] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[10] Prior to sentencing, the court vacated the conviction of felony murder, citing *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013), *State* v. *Roberts*, 158 Conn. App. 144, 118 A.3d 631 (2015), and *State* v. *Benefield*, 153 Conn. App. 691, 103 A.3d 990 (2014), cert. denied, 315 Conn. 913, 106 A.3d 305, cert. denied, U.S. , 135 S. Ct. 2386, 192 L. Ed. 2d 172 (2015). The court stated: "Pursuant to those cases, the court vacates the conviction herein for felony murder as violative of double jeopardy. That conviction may be reinstated if [the defendant's] conviction for murder is subsequently

reversed for reasons not related to the viability of the vacated conviction.”

[11] This appeal was transferred to this court from our Supreme Court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1 on June 6, 2019.

[12] Rule 2.11 (a) of the Code of Judicial Conduct provides in relevant part: “A judge shall disqualify himself or herself in any proceeding in which the judge’s impartiality might reasonably be questioned, including but not limited to the following circumstances: (1) The judge has a personal bias or prejudice concerning a party or a party’s lawyer, or personal knowledge of facts that are in dispute in the proceeding. . . . (4) The judge has made a public statement, other than in a court proceeding, judicial decision, or opinion, that commits or appears to commit the judge to reach a particular result or rule in a particular way in the proceeding or controversy.”

[13] A judge is prohibited from presiding over a proceeding in the following circumstances, as outlined in *Rizzo*: (1) in the case of a court trial, after a new trial is granted or judgment is reversed on appeal and, in the case of a jury trial, after a new trial is granted, (2) hearing a motion attacking the validity or sufficiency of an arrest warrant that the judge signed, (3) a trial for nonsummary contempt charges that arose before the judge, (4) a matter in which the judge previously acted as counsel, (5) a trial and sentencing following the judge’s participation in plea negotiations that were unsuccessful, (6) a civil trial in which the judge engaged in settlement discussions. *State* v. *Rizzo*, supra, 303 Conn. 119 n.38.

[14] DeNardis was the defendant’s probation officer from June 14, 2013, until April 15, 2015.

[15] Detective Perrone was the lead detective in the case and had initially shown DeNardis the photograph of the defendant for identification purposes on April 17, 2015.

[16] We note that the defendant’s argument at the hearing focused primarily on a separate issue that was not raised in the written motion, namely, that DeNardis’ identification of the defendant in the video footage from Eddy’s arose from unnecessarily suggestive procedures and was unreliable under the totality of the circumstances, in violation of the defendant’s right to due process. See *Manson* v. *Brathwaite*, 432 U.S. 98, 113–14, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). The evidentiary issue was only briefly addressed at the end of the hearing. On appeal, the defendant does not challenge DeNardis’ identification of the defendant as unnecessarily suggestive.

[17] The following colloquy took place at the suppression hearing between Officer Aklin and the prosecutor:

“A. So, while I was transporting [the defendant] back to New Haven Police Department, he asked me what kind of firearm I carry, and just out of the blue. So, in just casual conversation I said, why are you worried about what kind of gun I carry? And then just to change the subject. And his response was, after I asked him why are [you] worried about what kind of firearm I carry, his response was I’m infatuated with guns.

“Q. Okay.

“A. It kind of threw me off a little bit. So, just to change the subject, I just—I asked him . . . what [did] you want to be growing up? You know. And his response to that was, I always wanted to be a bank robber.

“Q. Okay. Now when you asked those questions, did you foresee that [the defendant] would make any kind of incriminating responses?

“A. Absolutely not.

“Q. And why did you ask those questions?

“A. You know, I just asked to . . . kind of change the subject off of what kind of firearm I carry kind of.

“Q. Okay. And . . . who started that conversation?

“A. I believe [the defendant] did. . . .

“Q. And did you ask him any questions relating to the case he was being arrested for?

“A. No. No. Because I know I can’t, because I would have to Mirandize him. So, I didn’t ask him anything regarding the case. . . .

“Q. Okay. Is it uncommon for you to strike up a casual conversation?

“A. Uncommon, no.”